UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF:
12 PERRY LANE, APARTMENT 207,
SWANZEY, NH, 03446
UNDER RULE 41

SW No. 24-mj-176-01-AJ

UNDER SEAL

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, T. Sean Hoover, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 12 Perry Lane, Apartment 207, Swanzey, New Hampshire, 03446, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

3. Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

6

## AFFIANT BACKGROUND

4.     I am a Special Agent employed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). As such, I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code; that is, an officer empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Section 2516 of Title 18. I have been employed by ATF since 2001 as a Special Agent. I have completed the Criminal Investigator Training Program and the ATF Special Agent Basic Training program, both of which are conducted at the Federal Law Enforcement Training Center in Glynn County, Georgia. I have received specialized training in firearms identification and the investigation of firearms-related offenses. I have participated in investigations involving the unlawful possession of firearms by prohibited persons, including persons who are previously convicted felons; the possession of firearms in furtherance of the distribution of narcotics; and the use of firearms in the commission of violent acts. I have participated in investigations involving individuals who unlawfully possess firearms, of individuals illegally selling firearms, and of individuals distributing illegal drugs. As such, I have coordinated the controlled purchases of illegal firearms and narcotics utilizing confidential sources, cooperating witnesses and undercover law enforcement officers; written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the illegal possession and distribution of firearms and narcotics; conducted electronic and physical surveillance of individuals involved in illegal drug distribution; analyzed records documenting the purchase and sale of firearms and illegal drugs; provided testimony, both in Grand Jury proceedings and District Court proceedings; and spoke with informants and subjects, as well as local, state and federal law enforcement officers,

regarding the manner in which individuals obtain, finance, store, manufacture, transport, and distribute their illegal firearms and drugs.  In addition, I have been involved in the investigation of street gangs, including gangs with a national presence as well as locally based gangs.  I have received training, both formal and on-the-job, in the provisions of the federal firearms and narcotics laws administered under Titles 18, 21 and 26 of the United States Code.  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 922(j) (possession of stolen firearms) and 18 U.S.C. § 922(j) (theft from a federal firearm licensee) (the "TARGET OFFENSES") that have been committed by Khale Guillou ("Guillou") and other unidentified persons, including others who may have been aided and abetted by, or conspiring with, the Subject, as well as others observed by the Subject.  There is also probable cause to search the PREMISES, further described in Attachment A, for the things described in Attachment B.

## **PROBABLE CAUSE**

### *July 6, 2024 theft from Trader John's Gun Shop*

7.      ATF Manchester Field Office is currently investigating a suspected attempted burglary at Trader John's Gun Shop, a Federal Firearms Licensee (FFL), located at 600 Keene Road, Winchester, New Hampshire. Trader John's Gun Shop is a standalone business with a parking lot in front, located immediately off Keene Road (NH Route-10), a major highway leading from Keene to Winchester.

8.      An initial review of security video from Trader John's Gun Shop shows that on July 06, 2024, at approximately 11:00 pm, an individual walked down the driveway of Trader John's Gun Shop. The individual depicted in the video is wearing long baggy pants and a hooded sweatshirt with the hood pull up over his head. The individual walked towards the camera moving from left to right in the frame and goes out of view and appears to walk along the south side of the building. I believe the suspect to be a male based on their body shape, size, and gait. The suspect proceeded to steal eighteen firearms from Trader John's Gun Shop based upon an inventory conducted by owner of Trader John's Gun Shop and ATF Industry Operations Investigators.

9.      On July 06, 2024, at approximately 11:08 pm the suspect made forced entry through a barricaded door on the southside of the building. The door was not alarmed at the time of the burglary. Upon entering the main room of the gun shop, motion sensors activated a silent alarm.

10.     The suspect proceeded to a glass display case that contained mostly new pistols and revolvers. The suspect pulled out a cloth bag that resembled a pillowcase along with a small

9

flashlight. The suspect used the flashlight to break the front glass on the display case. The suspect then proceeded to remove seventeen pistols from the display case. The suspect then stood and walked down in front of the other display cases looking with the flashlight. The suspect then hurriedly ran down the walkway in front of the display cases, turned and ran up the back of the display cases. The suspect grabbed one AR style rifle and then turned and rapidly exited the building through the south door. Security cameras did not capture the departure of the suspect outside.

11. On July 07, 2024, law enforcement processed the burglary scene and observed what appeared to be blood around the areas of the shattered glass of the multi-shelf display case. On the front edge of the middle shelf, law enforcement observed what appeared to be a blood smear. On the back lefthand corner of middle shelf, law enforcement located an approximate ½ inch by ½ inch shard of glass with what appeared to be blood on it. On the bottom shelf of the display, which was covered in faded red felt, law enforcement officers observed four pools of what appeared to be blood. Law enforcement officers also located what appeared to be a smear of blood along the bottom edge of the slide of one of the pistols that was not stolen out of the display. New Hampshire State Police gathered DNA samples from the blood on the edge of the middle shelf and from the broken shard of glass. These collected samples have been submitted for DNA testing at the New Hampshire State Police Laboratory. Law enforcement also collected the red felt, the shard of glass, and the firearm as evidence to be submitted for DNA testing as well.

12. Investigators began a neighborhood canvass of the area around Trader John's Gun Shop and the two main directions of travel for any suspect vehicles. Investigators identified three

locations south of Trader John's Gun Shop with security video that show the highway, and one business north of Trader John's gun shop that has a possible view of the highway.

### *Police Recover Four of the Stolen Firearms*

13. On July 15, 2024, in Tewksbury, MA, at approximately 5:06 am, a police officer was sitting in the parking lot of Jade East Restaurant when he heard approximately four (4) "pop" sounds that sounded like gun fire. Moments later a dark colored SUV pulled into the parking lot and traveled towards the officer at a high rate of speed. The operator[1] shouted, "they are shooting at me" and pointed at a compact silver sedan that was following the SUV. The officer observed that SUV was a silver Mazda bearing New Hampshire license plates and the vehicle had significant front-end damage. The officer activated his lights and initiated a pursuit of the silver vehicle. The Mazda was able to lose the officer shortly after the pursuit began.

14. The officer noticed that the dark SUV was following him and decided to disengage from the pursuit and directed the dark SUV to pull over. When the officer looked at the dark colored SUV, he noticed the right rear passenger window to be shattered. The driver of the dark SUV exited the vehicle and again stated that "they were shooting at me." The officer asked driver who "they" were, and the driver stated that he was supposed to be meeting his ex-girlfriend ("Person 1"[2]) to get some property back following their recent break up. According to the driver of the dark SUV, Person 1 said that they could meet at the Home Depot, 85 Main Street, Tewksbury, MA, to exchange the items. According to the driver of the dark SUV, he

---

[1] Police know the identity of the operator.

[2] Police know the identity of Person 1.

11

pulled into the parking lot and approached the silver car. There were three (3) individuals standing outside the car, one male he only knew by first name, Person 1, and an unknown female. The driver of the dark SUV stated that there were words exchanged and when he realized that Person 1 was not going to return his property, he got back in his car and began driving away. The driver of the dark SUV stated that as he was getting on to Main Street, he heard the first "pop." He stated that he believed this to be gunfire and began driving at a high rate of speed and added that he believed he heard approximately six (6) shot.

15. Another responding officer transmitted over the radio that he had located two (2) shell casings on Main Street. Investigating officers queried the FLOCK system, which is a license plate reader (LPR), and were able to identify a vehicle that matched the description of the suspect vehicle that the officer had lost in the pursuit. Using information in the FLOCK system, police identified the vehicle as a 2010 silver Mazda M3, bearing a NH registration 5306570, and registered to Guillou ("the Mazda") from Deering, New Hampshire.

16. Investigating officers contacted Deering Police Department (DPD) in an attempt to gain additional intelligence on Guillou. A DPD officer stated that he had recently arrested Guillou and that, at the time of the arrest, Guillou had provided the DPD with the PREMISES as his address. With the intelligence gather from FLOCK and the new address, police believed that the Mazda was headed towards Swanzey, NH.

17. Investigating officers reviewed security video from Home Depot showed the Mazda sitting in the parking lot. Three individuals were standing in front of the Mazda. The driver of the dark SUV entered the parking lot in his vehicle and traveled at the three standing individuals at a high rate of speed. The three individuals had to jump out of the way to avoid

being hit. The driver of the dark SUV stopped abruptly after passing the individuals, he then backed up at a high rate of speed, almost striking the three individuals again. The three individuals were forced to jump out of the way a second time. The dark SUV then stopped, and the three individuals approached the driver's side window. A conversation occurred for a few minutes, at which time, the driver of the dark SUV began circling the parking lot several times and ultimately speeds off. The three individuals got into the Mazda and left the parking lot. The shooting was not captured on the video.

18. Investigating officers contacted Swanzy Police Department (SPD) and asked if an officer could go by the address and confirm whether the Mazda was present. An SPD officer drove by the PREMISES and confirmed that the Mazda was there. The SPD officer then set up surveillance to observe the vehicle.

19. Investigating officers traveled to Swanzey, NH, to make contact with Guillou and the other individuals. Upon their arrival they noticed four individuals approaching the Mazda. The individuals were identified as Guillou, Person 1, Person 2, and a minor. At the time of the stop, Person 2 was in possession of a pistol, located in his front right pocket. Officers also noticed two (2) spent shell casings in the front passenger floor area.

20. Officers interviewed the Guillou, Person 1, and Person 2, individually, reading them their Miranda Rights from a Law Enforcement Dimensions card. Person 1 and Person 2 agreed to answer the officers' questions. Person 1 and Person 2 told accounts of what happened at the Home Depot. Their stories more aligned with what was seen on the Home Depot surveillance video. The two stated that Guillou was the driver and he was shooting the gun at the

13

vehicle. Guillou initially agreed to speak with officers after being read his Miranda Rights, but subsequently invoked his right to counsel.

21.    The Mazda was seized pending the issuance of a search warrant and was subsequently towed back to Swanzey Police Station. The pistol possessed by Person 2 was also seized for evidence. The individuals were released, and officers departed the location. When Tewksbury, Massachusetts officers processed the firearm and ran it through NCIC it was discovered that it was one (1) of eighteen (18) firearms stolen on July 6, 2024 from Trader John's Gun Shop. When Massachusetts State Police processed the vehicle, they located three more firearms in the trunk that were among those stolen from Trader John's Gun Shop on July 6, 2024.

22.    On July 20, 2024, an ATF agent reviewed six (6) videos that were cellphone recordings of security footage[3] at the 12 Perry Lane, Swanzey, New Hampshire (where the PREMISES is located). The President of Avanru Development Group, which owns the development that includes 12 Perry Lane in Swanzey, NH, had provided police with access to the building's security footage.

23.    It should be noted that not all the videos have a visible time stamp, but the police officer who created the cellphone recordings advised that the time stamps were not all accurate (the inside video is 12 hours fast and the outside video is 1 hour slow).

24.    In reviewing the footage, the agent saw the following:

---

[3] There were issues downloading the videos so the officer used a cellphone to record the security footage.

14

a. On July 6, 2024, at approximately 10:46 pm (when the time stamp on the video is adjusted for the time difference as per the officer who recorded the videos) a white male, who matches the description of Guillou, is seen leaving an apartment and walking down the hallway to a stairwell. The white male is wearing a black hooded sweatshirt, black pants, and black and brown footwear. The same white male is carrying something in left hand that is dark in color, is larger than his hand, and made soft material.

b. On July 6, 2024, at approximately 11:20 pm (when the time stamp on the video is adjusted for the time difference as per the officer who recorded the videos), a silver or grey colored, small Mazda SUV with driver's side door open. A white male, who appears to be the same white male as observed earlier, but is no longer wearing the hooded sweatshirt, exits out of the driver's seat. The same white male leans back into the vehicle. The agent was unable to determine what the white male was doing while leaned back inside the vehicle from the video. The same white male appeared pulled out a long bag that is dark in color and then closed the driver's door. The same white male walked toward the entrance to the building while holding the bag against his chest and with his right arm. The same white male continued to carry the bag toward the entrance of 12 Perry Lane. The agent noted that it was dark out at the time.

c. The same white male then entered the 12 Perry Lane building from the parking lot and opens door to stairwell. The same white male was still

15

       carrying the same black bag. The material in the bottom of the bag appeared to be strained by heavy weight.  As the male walked up the staircase, he appeared to be struggling with the bag. The male started on the left side of the staircase, crossed to the right side of the staircase while ascending, and used the wall with his right shoulder to keep his balance.  According to the officer who recorded the videos, this video follows the video described in the paragraph above.

   d. Next, the male exited the stairwell into a hallway and took a left. The male was still carrying the bag against his chest. It appeared that there was at least one (1) item in the bag that is the length of the bag, which is approximately from the male's head to approximately his mid-thigh.  According to the officer who recorded the videos, this video follows the video described in the paragraph above.

   25.    On July 19, 2024, another agent and I spoke with member of the United States Marshals Service (USMS), Concord, NH office.  That deputy advised that he and other members of the USMS Fugitive Task Force arrested Guillou at the PREMISES on July 19, 2024, on an extraditable warrant from Massachusetts relating to charges stemming from the shooting in Tewksbury. The deputy stated that officers conducted a safety check Guillou's apartment (for other people in plain view or areas large enough to conceal a person) and did not see firearms in plain view during that safety check.  The deputy said that there were locations within the PREMISES where firearms could have been secreted out of plain view.  The deputy did not recall whether Guillou had any wounds on his hands or arms.

26.     An officer from Tewksbury Police Department who was present for the attempted interview of Guillou informed me that he recalled that, at the time of arrest, Guillou had cuts "all over his hands".

27.     The landlord of the PREMISES told a police officer that Guillou currently rents out the PREMISES and that he is the sole renter, although a girlfriend has access to the PREMISES.

28.     Based upon information provided by Trader John's, the following firearms were stolen on July 6, 2024, and have not yet been recovered:

| Make | Model | Serial | Type | Caliber |
|---|---|---|---|---|
| Canik | TTI combat | 24CZ12571 | Pistol | 9mm |
| Glock | G17 Gen5 | CBCV897 | Pistol | 9mm |
| Glock | G19 Gen5 | BZUZ554 | Pistol | 9mm |
| Glock | G21 Gen5 | CAKF334 | Pistol | 45 Acp |
| Glock | G21 Gen5 | CATV786 | Pistol | 45 Acp |
| Glock | G23 Gen3 | CBGF449 | Pistol | 40 S+W |
| Springfield | Echelon | BE337334 | Pistol | 9mm |
| Glock | 43x MOS | CCDB942 | Pistol | 9mm |
| Glock | 19x | CCBY311 | Pistol | 9mm |
| Smith + Wesson | SD9 2.0 (13231) | EFF2708 | Pistol | 9mm |
| Sig Sauer | P365 XMacro | 66G077533 | Pistol | 9mm |
| Smith + Wesson | CSX | SBD8868 | Pistol | 9mm |
| Smith + Wesson | Equalizer (4188) | EFK9691 | Pistol | 9mm |
| Glock | G40 | BZVS810 | Pistol | 10mm |

☐ Some or all of the stolen/missing inventory listed in Section B falls within the purview of the National Firearms Act (NFA) (see Defi
| Certification                                             BZVS810

17

29.     I know from my experience as an ATF Agent, and in my participation with other agents in the execution of numerous search warrants authorizing the seizure of firearms, that those who own and possess firearms generally maintain possession of them for several years. Persons who own firearms generally keep them on their persons, in their residences and motor vehicles, or in places where they store their personal property. The reasons owners of firearms generally maintain and preserve them for several years include the facts that firearms are somewhat expensive, there is an administrative delay in buying them (particularly true when a mail service is used), and firearms do not easily wear out. In my experience, firearms are not depleted through use, nor are they often exchanged for another firearm immediately after being obtained. Firearms are like expensive tools, which their owners keep and maintain over several years. The reasons owners of firearms generally maintain firearms in and about their home or vehicles include the facts that maintenance of them in and about the home or vehicles permits easy access to the firearms, and firearms must be maintained in an environment where they will be secure from theft, as well as safe from rust and corrosion. In the residence, in the vehicle, and on the person, the firearm is readily available in the event the need for its use arises.

30.     I also know through my training and experience that illegally converted or possessed firearms are often secreted in a residence in an attempt to keep other individuals or law enforcement from the discovery of illegally obtained weapons. It also know through my training and experience that individuals often secret those illegally obtained firearms in common areas of a residence or apartment buildings such as laundry rooms, living rooms, kitchens and/or outbuildings. I also know through my experience that almost without exception individuals who

possess firearms, including stolen firearms, also possess related items such as gun cases, ammunition, gun cleaning supplies and equipment, related to the care and maintenance of the firearms.

31.    I know that when people steal firearms from federal firearms licensees those firearms typically have retail tags on them. Often, those tags are removed and discarded in the first location where the firearms are taken.

32.    I know, based on my training and experience, that people routinely re-wear clothing and accessories, like bags and flashlights, and store those items in their home. Clothing and accessories consistent with those worn during the theft constitute evidence of the commission of the offenses discussed herein, in that Guillou can be visually identified as the individual in the surveillance videos discussed above, in part through the distinct attire and accessories worn and used during the theft.

33.    In addition, the video shows that the suspect appears to use a cellphone during the theft. I know that it is common for people to carry with them on their person, or to keep within their residence, cellphones. Guillou is currently in custody, so his cellphone is most likely at PREMISES, where he was arrested. I also know that people often save old cellphones. The warrant seeks authority to seize all cellphones found on the PREMISES because upon seizure agents will not be able to readily determine which phone was used during the theft. Agents will then apply for an additional warrant to search those phones.

34.    In know, based on my training and experience, that people who commit thefts of gun stores often research those stores ahead of time (including the locations of stores, the store layout, and any visible security measures), and often from a place where they feel secure, like in

19

their homes.

35.     This investigation will also include analysis of DNA recovered at Trader John's and, as such, I am seeking authority to seize items from the PREMISES to compare with the DNA recovered from the theft, including toothbrushes and hairbrushes.

### AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

36.     Though Guillou is the only individual who leases the PREMISES, I have learned that his girlfriend also frequents the residents.  Moreover, the door to the PREMISES is currently unlocked.  At this time, police are securing the property.  I therefore seek authorization to execute this warrant any time day or night so that agents can execute the warrant before any evidence in the PREMISES is compromised.

### CONCLUSION

37.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

 s/ T. Sean Hoover
T. Sean Hoover
Special Agent
ATF

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on July 20, 2024.

ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

*Property to be searched*

The property to be searched is 12 Perry Lane, Apartment 207, Swanzey, New Hampshire, 03446, (the "PREMISES").  12 Perry Lane in Swanzey, New Hampshire is a three story, multiple unit apartment complex with an exterior parking lot, as depicted in Image 1 (below).  "12" is clearly marked on the exterior of the building, as depicted in Image 2 (below).  Apartment 207 is located on the second floor of the building.  "207" is clearly marked on the right side of the door to apartment 207, as depicted in Image 3 (below).



*Image 1*



*Image 2*

2



*Image 3*

3

## ATTACHMENT B

*Property to be seized*

1. The items to be seized are fruits, evidence, information, contraband, or instrumentalities, relating to violations of 18 U.S.C. § 922(j) (possession of stolen firearms) and 922(u) (theft from a federal firearms licensee) (the "TARGET OFFENSES") that have been committed by Khale Guillou ("the Subject") and other identified and unidentified persons, as described in the search warrant affidavit; including, but not limited to:

   a. Clothing worn by subject during the theft from Trader John's Gun Shop on July 6, 2024, to include a hooded sweatshirt with a logo on the left chest, what appears to be a kangaroo pocket on the front, and a double seam on the hood, and pants with cargo pockets on the side;

   b. Articles related to or used during the theft from Trader John's Gun Shop on July 6, 2024, including bags, flashlights, and cellphones, and shards of glass from firearms cases;

   c. Records, documents, and evidence relating to Trader John's Gun Shop and other federal firearms licensees, including evidence of preplanning and research into federal firearms licensees;

   d. Indicia of ownership of the PREMISES;

   e. Toothbrushes and hairbrushes;

   f. The following firearms:

4

| Make | | Model | Serial | Type | Caliber |
|---|---|---|---|---|---|
| Canik | | TTI Combat | 24CZ12571 | Pistol | 9mm |
| Glock | | G17Gen5 | CBCV897 | Pistol | 9mm |
| Glock | | G19Gen5 | BZUZ554 | Pistol | 9mm |
| Glock | | G21Gen5 | CAKF334 | Pistol | 45Acp |
| Glock | | G21Gen5 | CATV786 | Pistol | 45Acp |
| Glock | | G23Gen3 | CBGF449 | Pistol | 40s+w |
| Springfield | | Echelon | BE337334 | Pistol | 9mm |
| Glock | | 43xMOS | CCDB942 | Pistol | 9mm |
| Glock | | 19x | CCBY311 | Pistol | 9mm |
| Smith + Wesson | | SD9 2.0 13931 | EFF2708 | Pistol | 9mm |
| Sig Sauer | | P365 XMacro | 66G077533 | Pistol | 9mm |
| Smith + Wesson | | CSX | SBD8868 | Pistol | 9mm |
| Smith + Wesson | | Equalizer 14188 | EFK9691 | Pistol | 9mm |
| Glock | | G40 | BZU5810 | Pistol | 10mm |

☐ Some or all of the stolen/missing inventory listed in Section B falls within the purview of the National Firearms Act (NFA) (see Defi

**Certification**     BZVS810

5